**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| VITALSIGNS HOMECARE, INC. | : | CASE NO. 08-41101-JBR |
| <u>DEBTORS</u> | : | |

**AMENDED MEMORANDUM OF DECISION ON MOTION TO AUTHORIZE SALE OF PROPERTY OF THE ESTATE (I.E. THE DEBTOR'S MEDICARE PROVIDER NUMBER) FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES**

This matter came before the Court for hearing on the Chapter 7 Trustee's Motion to Authorize the Sale of Property of the Estate (namely, the Debtor's Medicare provider number), Free and Clear of Liens, Claims, and Encumbrances (#75) and the Partial Objection of the Department of Health and Human Services ("HHS") (#83).  The potential purchaser, ABC Home & Healthcare, Inc. ("ABC"), filed a Statement in Support (#86) of the Trustee's Motion.

**FACTS**

The facts are not in dispute.  The Debtor, which at that time was engaged in providing home health care services, filed a voluntary petition pursuant to Chapter 11 of the United States Bankruptcy Code on April 9, 2008.  The Debtor was a participant in the Medicare program.  As such, the Debtor was eligible to be paid the reasonable cost of covered services its employees rendered to Medicare beneficiaries.  In order to bill and receive payment, the Debtor was required to be enrolled as a Medicare provider and have a Medicare provider number.

On May 29, 2008 the case was converted to one under Chapter 7 and on the same day the Chapter 7 Trustee was appointed.  The Debtor's operations ceased and the Chapter 7 Trustee transferred the Debtor's patients to other home health care

agencies. ABC, which is not currently an approved Medicare provider, was not among the agencies to which any of the Debtor's patients were transferred.

On July 3, 2008 the Chapter 7 Trustee sought Court approval to establish a procedure to disclose certain information to ABC in order for ABC to conduct due diligence in connection with its anticipated offer to purchase the Medicare provider number. On July 18, 2008 the Chapter 7 Trustee submitted the final Medicare billing for services rendered by the Debtor. Approximately one month later, the Chapter 7 Trustee filed his motion to sell the Medicare provider number and "any and all rights, privileges and entitlements associated therewith," free of liens, claims, and encumbrances, to ABC for $40,000. Among the claims which the Chapter 7 Trustee seeks to shed is HHS' right to recoup overpayments from future Medicare payments. The United States, on behalf of HHS, objects.

**POSITION OF THE PARTIES**

The Trustee and ABC urge the Court to enter an order permitting the sale of the Medicare provider number, free of any liens, claims or encumbrances, including the right of HHS to seek recoupment for any overpayment. Arguing that the Court of Appeals for the First Circuit has never addressed the issue currently before this Court, the Chapter 7 Trustee and ABC rely on *In re BDK Health Management, Inc.*, 1998 WL 34188241 (Bankr. M.D.Fla. Nov. 16, 1991), as support for their contention that the provider number constitutes a statutory entitlement, not an executory contract subject to the requirements of 11 U.S.C. § 365. In addition, because ABC must be approved by HHS as a qualified participant as a precondition to its acquisition of the provider number, the Trustee asks to extend the period of inactivity for billing under the provider

number from six months to such time as it may take for ABC's approval to be completed and the sale to be consummated.  The Trustee also asks that the Court not consider HHS' objection as it was filed two business days after the deadline for filing objections to the sale.

ABC further urges approval of the sale on equitable grounds.  It alleges that the amount of the overpayment is unliquidated but asserts that the numbers bandied about suggest the overpayment could be as high as $800,000.[1]  It asserts that no one will acquire the asset with this liability attached so terminating HHS' right of recoupment is the estate's only hope for obtaining value for the asset.  Furthermore, it notes it is not purchasing the Debtor's receivables so HHS would be free to assert its recoupment rights against those funds.  Finally it argues that it has not taken over responsibility for any of the Debtor's former patients; it is not a continuation of the Debtor's business.

The United States filed a partial objection, albeit, two business days late.  It argues that its lateness should be excused because it only received the motion to sell one day before the objection deadline.  It apparently has no objection to extend the period of inactivity for billing under the provider number from six months to such time as it may take for ABC's approval to be completed, provided that HHS retains its ability to approve or deny ABC's application to qualify as a Medicare provider under HHS' regulations.  Its objection lies solely with the Trustee's attempt to terminate what it asserts is its right to recoup overpayments to the Debtor from ABC.  It alleges that the Medicare Provider Agreement is an executory contract.  It notes that courts, with the

---

[1]Although no final accounting has been done, the United States asserted that the amount of the recoupment is closer to $10,000.

exception of the *BDK* court, have concluded the Medicare contract is executory. But even if Court does not agree it is an executory contract, the United States argues that § 363 of the Bankruptcy Code cannot extinguish its right of recoupment as this action would impair the Medicare scheme created by Congress.

**DISCUSSION**

<u>The Opposition to the Late-Filed Objection</u>

As an initial matter, the Court must determine whether HHS' objection should be stricken as untimely. Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure provides, with exceptions not relevant to the instant matter:

> ... when an act is required or allowed to be done at or within
> a specified period by these rules or by a notice given
> thereunder or by order of court, the court for cause shown
> may at any time in its discretion ... (2) on motion made after
> the expiration of the specified period permit the act to be
> done where the failure to act was the result of excusable
> neglect.

"Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Pioneer Investment Services Co. v. Brunswick Associates, Ltd.,* 507 U.S. 380, 388, 113 S.Ct. 1489, 11495, 23 L.Ed.2d 74 (1993). Under the excusable neglect standard, there must be both neglect, which includes leaving an act undone or unattended, especially through carelessness, and the neglect must be excusable. The determination of whether the neglect is "excusable", the second prong of the test, "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include ... the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial

4

proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether movant acted in good faith." *Id.,* 507 U.S. at 395, 113 S.Ct. at 1498.

Although the United States did not file a separate motion to permit the late filing, the objection itself includes such a request.  Specifically the United States averred that it did not receive a copy of the motion until September 18, 2008, one day before the objection deadline established by the Court, when a copy of the motion was forwarded from HHS to office of the United States Attorney for the District of Massachusetts.  The United States noted that it needed additional time "to ascertain the position of all relevant agency authorities..." and that it unsuccessfully sought the Chapter 7 Trustee's assent to extend the objection deadline.

The certificate of service indicates that the United States Attorney was properly served with the motion at the same time HHS was served.  Therefore the delay in responding cannot be attributed to incomplete service.  Nevertheless the Motion to Sell was not heard until October 2, 2008, some nine days after the objection was filed.  Moreover ABC filed its statement in support of the sale, one day before the hearing, in response to the objection and addressed the substantive arguments raised by the United States.  Therefore the harm to the proponents of the sale is non-existent while the prejudice to the United States, namely a severance of HHS' asserted right to recoup overpayments from the buyer, is too great to overrule the objection on the grounds that it was two business days late.

<u>The Right to Recoup Overpayments</u>

The parties have framed the issue as whether the Bankruptcy Code permits the

5

sale of a Medicare provider number free of any claims for recoupment against the successor and agree that this is a case of first impression in this circuit. In fact, the case law addressing this issue is scant and contradictory. Some courts hold that the provider number arises under an executory contract while others conclude that reimbursement is a statutory entitlement. The split appears to be driven by the context and arena in which the question originates with a majority of bankruptcy courts concluding the provider number arises out of an executory contract. Often there is little discussion of the issue of what the provider number is and how it arises. Complicating the analysis is the complex Medicare scheme set forth in the Title XVIII of the Social Security Act and the regulations promulgated thereunder. Some basic understanding of the Medicare program is helpful to understand the Court's analysis of the issue.

### The Medicare Program[2]

Medicare is a federally-subsidized health insurance program for the elderly and certain disabled persons. *See generally* 42 U.S.C. §§ 1395 *et seq*. It consists of two parts: Medicare Part A, codified at 42 U.S.C. §§ 1395c-1395i-4, and Medicare Part B, codified at §§ 1395j-1395w-4. Medicare Part A authorizes direct payment to a Medicare provider for covered services that are often described as "hospital covered services," while Medicare Part B is a form of medical insurance for which the beneficiary-patient pays an annual premium. Both Parts A and B provide payment for

---

[2] The parties did not address the structure of the Medicare program in any of their pleadings, leaving the Court to parse the statute, regulations, and case law dealing with the Medicare program.

6

home health services although each part provides somewhat different coverage.[3]

The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), which is a component of the United States Department of Health and Human Services ("HHS"), formerly known as the Department of Health, Education and Welfare ("HEW").  CMS, in turn, contracts with regional providers, called fiscal intermediaries, to review, process, and pay Medicare claims.  Payment to providers such as the Debtor is actually made on an interim basis under a system of prospective reimbursement.  42 C.F.R. § 413.60.  This results in payments to a provider prior to a determination that the services rendered are covered and the costs reasonable. Because the Medicare program mandates that only the reasonable cost of covered services be paid, however, these same fiscal intermediaries also audit claims for reimbursement to determine the appropriateness of payments requested and made.[4]   If, after completion of the audit, the fiscal intermediary determines that a provider is overpaid, HHS has the right to recover the overpayments from the provider.  42 U.S.C. § 1395g(a)("The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid ... with necessary adjustments on account of previously made overpayments or

---

[3]For example, Medicare Part A covers up to 100 home health visits following a hospital stay of at least three days while Part B covers home health visits not preceded by a hospital stay and visits over the 100-day Part A limit.  Participation in Part B is voluntary and Medicare beneficiaries pay a premium for Medicare Part B coverage.

[4] The parties have not identified the Debtor's fiscal intermediary or whether it received notice of the motion to sell.  This omission is not material to the Court's decision.

underpayments...."). "The Secretary's regulation permits the intermediary, in an overpayment situation, either to seek to recover the full extent of prior overpayments-threatening to suspend a provider's participation in Medicare if it does not pay-or to enter into an agreement with the provider (which is what occurred here) whereby the provider continues its services with appropriate deductions for the past overpayments. *See* 42 C.F.R. § 405.373(a)(2)." *U.S. v. Consumer Health Services of America, Inc.,* 108 F.3d 390, 396, 323 U.S.App.D.C. 336, 342 (Fed. Cir. 1997).

> Medicare reimbursement payments are made on a continuing basis throughout the year based upon claims filed by the provider and are called "interim payments." Annually, the provider must file a Provider Cost Report with the Fiscal Intermediary to permit the Intermediary to audit the claimed costs and determine whether the costs claimed are proper. Once adjustments are made, the FI determines whether the provider has been overpaid or underpaid for the costs allowable for the year.

*In re United States v. White*, 492 F.3d 380, 388 (6th Cir. 2007). *See also* 42 U.S.C § 1395g. The interim payments are in reality estimates of the reimbursement due. "[U]nderpayments and overpayments are an expected and inevitable result of this payment system." *Sims v. United States Department of Health & Human Services (In re TLC Hospitals, Inc.)*, 224 F.3d 1008, 1012 (9th Cir, 2000).[5]

---

[5] Rodney A, Johnson, Healthcare Regulatory Concerns Involved in the Acquisition and Sale of Insolvent Healthcare Companies, American Health Care Attorneys, seminar materials, February 2001 , available on Westlaw at AHLA-Papers P02050115, provides a concise synopsis of the timetable involved in finalizing these interim payments.
> Although interim payments are made throughout the provider's fiscal year, no sum is truly due and owing a

Case 08-41101    Doc 98    Filed 10/29/08    Entered 10/29/08 13:12:19    Desc Main
                           Document      Page 9 of 17

Enrolled Medicare Providers

Reimbursement for services under Medicare may only be made to a provider enrolled as a medicare provider. 42 U.S.C.A. § 1395cc. In order to become enrolled as a Medicare provider, a provider must submit an enrollment application on the enrollment application form prescribed by CMS, submit to whatever survey and certification or accreditation process deemed necessary by CMS, and meet additional requirements set forth in the regulations, including those relating to the accuracy of the information on the completed application and the requirement to report changes to the information contained on the application. *See* 42 C.F.R. § 424.510(a) and (c); §

---

provider until such time as the provider submits its fiscal period year cost report and the reasonable cost determination has been made by the fiscal intermediary. To accomplish this reasonable cost determination, the provider is required to file with the fiscal intermediary its annual cost report within five (5) months of the end of the cost reporting period. Through the cost report process, payments are reconciled with actual reimbursement due the provider on a yearly basis. See 42 C.F.R. Part 413, Subpart E. When the intermediary has finished its review of a cost report, it issues the Notice of Program Reimbursement (NPR), which identifies any adjustments and states the amount of any Medicare underpayment and reimbursement due the provider, or the amount of any overpayment and reimbursement owed to the program. See See 42 U.S.C. § 1395g; 42 C.F.R.§413.60 and § 405.1803.

If, after audit, a provider is dissatisfied with the outcome, it must exhaust its administrative remedies beginning with the Provider Reimbursement Review Board. Although there is no statute of limitations for the completion of the audit although the court in *Secretary. Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, 342 (5th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976), found the three year statute of limitations found in 42 U.S.C. § 1395gg (a section generally prohibiting recovery of overpayments from Medicare beneficiaries) applicable to recoupment of overpayments from a provider.

424.515; and § 424.520(b). Upon determination that an applicant is qualified to be enrolled in the Medicare program, CMS provides written notice of its decision along with two copies of a provider agreement. 42 C.F.R. § 489.11(a). If the applicant chooses to enroll, it must sign and return both copies of the agreement, along with a written statement regarding past or pending insolvency proceedings. 42 C.F.R. § 489.11(b). If the agreement is accepted by CMS, it returns one copy, which specifies the effective date of the agreement. 42 C.F.R. § 489.11(c).[6] Once enrolled, the provider is issued a valid billing number, 42 C.F.R. § 424.505, and may commence submitting claims for reimbursement of covered goods and/or services under the Medicare program.

The Sale of a Provider Number

As ABC has indicated, the process by which an entity or individual becomes an can be lengthy. A transfer of the provider number from one entity to another eliminates any gap in the billing process.

42 C.F.R. § 424.550 provides:

> A provider or supplier is prohibited from selling its Medicare billing number or privileges to any individual or entity, or allowing another individual or entity to use its Medicare billing number.

The applicable regulations, however, permit the assignment of the provider number as part of a change in ownership. 42 C.F.R. § 489.18. Upon a change of ownership of the provider number, the existing provider agreement is automatically assigned to the new owner. 42 C.F.R. § 489.18(c). The new owner takes the provider

---

[6]The essential elements of the provider agreement are set forth in 42 C.F.R. § 489.20.

agreement subject to the same terms and conditions as the previous owner,  42 C.F.R. § 489.18(d).  Outside of the bankruptcy arena at least, when a change of ownership occurs and the new owner accepts the prior owner's provider agreement, overpayments to the previous owner may be recovered from the new owner.  *United States v.Vernon Home Health, Inc,* 21 F.3d 693 (6th Cir.), *cert denied* 513 U.S. 1015, 115 S.Ct. 575 (1994); *Triad at Jeffersonville I, LLC v. Leavitt*, 563 F. Supp.2d 1, 18 (D.D.C. 2008)("A sales agreement stipulating that the new owner is not liable for the overpayments made to the previous owner is not evidence enough for recovery from the new owner to not occur ... If the new owner assumes assignment of the Medicare agreement, Medicare will attempt to recover from the new/current owner regardless of the sales agreement").[7]

But the transaction contemplated by the Chapter 7 Trustee and ABC does not involve any transfer that would bring the sale of the Medicare provider number within the definitions of change of ownership set forth in 42 C.F.R. § 489.18(a).  Indeed ABC is clear: it does not want to be viewed as a continuation of the Debtor's business. Therefore the Court must confront the question of whether a provider number, standing alone, may be sold by the Debtor.

The Trustee and ABC assert that the *BDK* case is on all fours with the instant case.  In *BDK*, the buyer offered to purchase substantially all of the debtor's assets, not just the provider number.  The letter of intent, however, did include an express provision

---

[7]*Triad* involved the sale of five facilities previously owned by an entity the court identified only as "Mariner."  *Triad*, 563 F. Supp. at 8.  This Court notes that *Mariner Post-Acute Network, Inc.* and its related affiliates filed bankruptcies in the United States Bankruptcy Court for the District of Delaware in January 2000, Case No 00-00113, *et al.* The decision does not address whether the sale occurred as part of the bankruptcy.

11

that the sale was to be free and clear of all liens, claims and encumbrances, including any rights of HHS or HCFA to seek recoupment of overpayments made to the debtor from the buyer. HHS objected on the grounds that the provider numbers are executory contracts that must first be assumed before they could be transferred. The court overruled the objection "based on the argument of counsel, the appropriate and the evidence accepted by this Court." *Id.* at 3. In rejecting HHS' argument that the sale was an impermissible attempt to transfer executory contracts, the court stated that "[t]he rights and duties of a health care provider and HHS are set forth not in provider numbers but rather in the Medicare Statutes and Regulations....HHS' entitlement to recoup overpayments is similarly statutory and does not arise under these arrangements." *Id.* at 6. The court specifically pointed out that HHS had not introduced any evidence of the provider agreement or its terms. Moreover, it distinguished those cases cited by HHS for the proposition that the arrangements between HHS and its providers are executory contracts by noting that none of the parties in those cases challenged HHS' assertion; in fact virtually all the parties agreed.

The decision also rests on equitable grounds, namely that the sale would preserve the going concern value and that the buyer's principal testified that absent the termination of the right of recoupment against the buyer's future medicare income, it would not proceed with the sale. In attempting to fashion some remedy, the court left HHS with a claim against the sale proceeds.

As the *BDK* court recognized, however, a majority of bankruptcy court considering the Medicare-provider relationship conclude that the Medicare provider

agreement, with its attendant benefits and burdens, is an executory contract. *See In re University Medical Center*, 973 F.2d 1065, 1075 and n. 13 (3d Cir. 1992)(concluding that HHS' offset of postpetition funds against prepetition overpayment violated the automatic stay because debtor had not yet assumed or rejected its provider agreement); *In re Advanced Professional Home Health Care, Inc.*, 94 B.R. 95 (E.D. Mich. 1988)(In permitting postpetition recoupment of prepetition overpayments, the court stated "the relationship between the Secretary and Advanced is governed by a complex statutory scheme. Under that scheme, Advanced could not continue as a provider following the filing of a petition for reorganization on November 12, 1986 unless it effectively assumed the obligations of the provider agreement under which it had previously been operating. 42 U.S.C. § 1395 *et seq.*"); *In re Memorial Hospital of Iowa County, Inc.* 82 B.R.478 (W.D. Wis.), *appeal dismissed*, 862 F.2d 1299 (7th Cir. 1988); *In re Tri County Home Health Services, Inc.*, 230 B.R. 106, 111 (Bankr. W.D. Tenn.1999)("Recoupment is generally allowed in cases involving a single *contract* which called for advance payments based on estimates, subject to correction at a later time.... Indeed, this is precisely the nature and character of Medicare reimbursement to health care providers. *See,* 42 U.S.C. § 1395g(a)."); *In re Tidewater Memorial Hosp., Inc.*, 106 B.R. 876, 883 (Bankr. E.D.Va.1989).

In *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 4 (1st Cir. 2004), the court of appeals concluded that HHS was exercising its right of recoupment when recovering past overpayments from current payments and thus did not violate the automatic stay or receive preferential payments. In so holding it stated:

> We ... hold that the HCFA recovery of ... overpayments previously made to Holyoke constituted a transaction in the nature of a recoupment, rather than a setoff. As such, it was neither a voidable preferential transfer nor a violation of the automatic stay. Both the Medicare statute and the provider agreement--by contemplating HCFA's payment of estimated costs, corrective audits, and retroactive adjustments or partial adjustments for overpayments and underpayments in determining HCFA's net liability for current cost-year services--strongly indicate that the *contractual relationship* between HCFA and Holyoke constitutes one, ongoing, integrated transaction. [Emphasis added].

Although *Holyoke Nursing Home* does not directly address the issue before this Court, the above-quoted dicta suggests that this circuit, if confronted with the issue, would view the issue much as the *Advanced Professional Home Health Care* court did: the provider number and the provider agreement are part and parcel of a complicated statutory scheme. It appears that the provider agreement, the statute, and the regulations form an arrangement that imposes both benefits and burdens on the provider. It cannot accept the benefits without the attendant burdens.

Moreover the Court is mindful of the principle of statutory construction that "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483 (1974). "The courts are not at liberty to pick and choose among congressional enactments." *Id.*

The outcome urged by the Trustee and ABC renders HHS' right to recoup overpayments a nullity and thwarts a fundamental principle of the Medicare scheme, namely providing health care to the elderly and disabled while protecting the public fisc.

> [HHS] is charged with protecting the interests of Medicare
> beneficiaries and with the effective management of the
> public funds entrusted to the Medicare program. HHS "has a
> critical interest in maintaining the integrity of the Medicare
> program for the benefit of all, including the taxpaying public."
> *Neurological Associates-H Hooshmand v. Bowen,* 658
> F.Supp. 468, 473 (S.D.Fla.1987). Depletion of the Medicare
> trust fund by continuing to pay a Medicare provider to whom
> an excess has already been paid violates HHS' public
> charge to effectively administer the Medicare Trust Fund.

*Tri County Home Health Services*, 230 B.R. at 113. Requiring the provider agreement to be assumed prior to its sale, however, harmonizes both the Medicare and Bankruptcy statutes.

Yet the Court is aware of the factual conundrum in this case. While HHS has a right to recover overpayments, whether the right to reimbursement is viewed as a contractual right or a statutory entitlement, the amount of the overpayment, if any, which the United States and HHS would urge be viewed as the cure amount, is not yet fixed and the amount ranges from $10,000 to $800,000.[8]

The Court is sympathetic to the Trustee's desire to maximize recovery for the benefit of creditors even as it is mindful of the *Holyoke Nursing Home* court's admonition

> the equitable powers of the bankruptcy court do not accord it
> "a roving commission to do equity," *In re Ludlow Hosp.*

---

[8]Although the fiscal intermediary performs annual audits of the cost reports, it is unclear when its determination of any over or underpayments will be finalized. Moreover a Medicare provider, if the amount in controversy is $10,000 or more, has additional administrative appellate rights it may pursue with the Provider Reimbursement Review Board. Upon exhaustion of its administrative remedies, the Medicare provider may pursue judicial review. 42 U.S.C. § 1395oo; 42 C.F.R. Part 405, Subpart R. While the appeals are pending, recovery of the overpayment is not stayed. 42 C.F.R. § 405.1803(c).

>   *Soc'y, Inc.,* 124 F.3d 22, 27 (1st Cir.1997) (citation omitted), nor "authorize courts to create substantive rights that are otherwise unavailable under the Code, or to expand the contractual obligations of parties." *Id.* (quoting *Official, Unsecured Creditors' Comm. v. Stern ( In re SPM Mfg. Corp.*), 984 F.2d 1305, 1311 (1st Cir.1993)). As we conclude that Congress contemplated that the Medicare provider agreements would constitute a single, ongoing, and integrated transaction, the equitable powers of the bankruptcy court do not entitle it to second-guess Congress's implicit policy choices. Both by statute and by contract, the HCFA has the unqualified right to recoup these overpayments *in full,* and to return the funds to the public fisc, where they can be used to fund other facilities providing care to Medicare beneficiaries. In our view, public policy would be ill-served by permitting insolvent providers-like Holyoke-a windfall at the expense of other Medicare providers which have managed their facilities prudently to avoid chapter 11.

*Holyoke Nursing Home*, 372. F.3d at 5.

Without rewriting the Bankruptcy Code or ignoring HHS' charge under the Medicare program, the Court ultimately concludes that the sale should be approved but that the parties be aware of the priority under which this Court believes HHS may recover any overpayments.  First, HHS may recoup overpayments from any payments due to the Debtor's estate from HHS; next it may recoup against funds held by the Trustee if such funds were generated by the past interim Medicare payments; next against any sale proceeds generated by the sale of the provider number; and finally to the extent there remains any overpayments to be recovered, HHS may proceed against the entity to which the Debtor's provider number is assigned.  Nothing herein shall be interpreted, however, as terminating HHS' right to file a claim against the Debtor's estate or the Trustee's right to object thereto.

**CONCLUSION**

For the reasons set forth herein, the Trustee's Motion to Authorize the Sale of Property of the Estate (namely, the Debtor's Medicare provider number), Free and Clear of Liens, Claims, and Encumbrances (#75) is ALLOWED on the terms and conditions set forth herein.

A separate order has issued.

*/s/ Joel B. Rosenthal*

Dated: October 29, 2008        _____
                               Joel B. Rosenthal
                               United States Bankruptcy Judge